**RUDENBERG v. CLARK, Attorney General.**
Civil Action No. 3873.

District Court, D. Massachusetts.
June 24, 1947.

As Amended June 25 and 26, 1947.

Willis H. Taylor, Jr., and J. Philip Anderegg, both of New York City, for plaintiff.

Walter T. Nolte, Atty., Department of Justice, of Washington, D. C., for defendant.

WYZANSKI, District Judge.

Relying on Section 9(a) of the Trading with the Enemy Act, as amended, 50 U.S.C.A.Appendix, § 9(a), Reinhold Rudenberg sues the Attorney General to recover U. S. Letters Patent Nos. 2,058,914 and 2,070,-319 which the Attorney General's predecessor, the Alien Property Custodian, vested in himself by Vesting Orders Nos. 27 and 112, dated respectively June 18, 1942, and August 25, 1942. The Custodian acted on the theory that the patents stood in the name of and were the property of Siemens-Schuckertwerke, A. G., the widely known German manufacturer of electrical apparatus. The plaintiff's claim is that he is in truth the beneficial owner of the patents.

The barebones of the controversy are easy to state even though they have in themselves not a little drama—a drama that reveals in most striking fashion the character and quality of the plaintiff himself. Indeed, during the trial, and since then in reflecting on the evidence, I have come to the conclusion that the ultimate and decisive issues of fact can only be resolved by considering the sort of man Professor Rudenberg is and has been. And so, quite out of the usual order in this type of case, but because I hope to convey to an appellate court what seems to me the dominant aspect of the litigation, I shall begin with a description of the impression Professor Rudenberg—whom I had never seen before the case began—made upon me at the trial.

From the moment he took the stand it was evident to all in the courtroom that the plaintiff adhered to the highest traditions of the scientific profession of which he is admittedly an outstanding member. He consistently showed the deepest concern for the truth. Each of his statements was made with scrupulous accuracy—nothing was underlined or omitted out of self-interest or other extraneous considerations. He told of the part he had played with humility, almost with diffidence. He was generous to his former colleagues beyond what they could justifiably have expected. He explained his relations with his former employers so that one could not disbelieve his account of them. It was transparent that he had acted throughout as a gentleman working with men whom he respected and who respected him. Their interest and his obligations to them and to the organization of which he was a part had obviously weighed more with him than his own profit and advantage. And at no time had he aggressively asserted what a person of less dignity and essential fineness of spirit might well have regarded as his technical rights.

Moreover, he carried into his presentation of his claim the same spirit of scientific detachment and understatement which undoubtedly characterized his day to day work in the laboratory. It was his way to await developments and the knowledge that comes from certainty. He wanted to be sure what he could prove before he made a claim. He never resorted to, if indeed he knew anything of, the art of claiming all in the hope of proving and keeping a part.

The story begins in Germany where Professor Rudenberg was associated with Siemens-Schuckertwerke, A. G., one of

the largest and best-known German electrical manufacturing firms. For convenience I shall call it SSW. The company had plants in various places throughout the world including Berlin, Germany. Its line of products, while extensive, included principally apparatus for the high current field, especially generators and conductors for power companies, and did not embrace microscopes or optical instruments. [R. 122, 162; Wiegand, Dep. 29, 43.] SSW was affiliated with Siemens & Halske by virtue of the fact that about 50% of its stock was owned by Siemens & Halske. For convenience I shall call the stockholder SH. SH was engaged in the production of electrical apparatus for telephones and other uses. The two companies had many interests which were tangent, and consultation between their officers and employees was frequent. However, they were distinct corporate entities.

Professor Rudenberg was employed by SSW continuously from 1913 to April, 1936. After March 2, 1923, he was Chief Electrical Engineer of SSW and head of its scientific department. In this post he had charge of the research work and the electron and other laboratories connected with the products which were then manufactured and which might be manufactured by SSW. But he was not responsible for research connected with SH products.

His contract of employment, which was made in Germany, specifically incorporated certain company regulations applying to such inventions as he might make during his term of employment. These regulations and their background had a long history in Germany. In the Nineteenth Century and down to the days of the Weimar Republic large industrial firms in Germany had required their employees to turn over to their employers all inventions made during the period of employment. The more liberal atmosphere which followed World War I and the apprehension of possible legislation led various companies including SSW to change their regulations so as to limit the rights upon which employers had previously insisted. It became common to distinguish three classes of inventions— "shop inventions" (which were mere improvements in shop practice), "service inventions" (which were a greater departure from what the employer had already known but which were in the general line of the employer's activities), and "free inventions" (which were outside of the scope of the employer's regular interests). Just such a distinction was embodied in the SSW regulations which were in 1931 a part of Professor Rudenberg's contract of employment.

As applied in the Rudenberg contract of employment these regulations gave to SSW with respect to free inventions of Professor Rudenberg only what might be called a "first refusal." The company had with respect to such a free invention, that is, an invention outside the company's field of interest, only a right or option for a limited time [cf. Wiegand, Dep. 15] to bid against competitors and to be preferred only if it equalled or exceeded the competitor's bid. But where an invention was in the "service" classification, the company had the right to apply for the patent, to keep the title to the patent, and to exploit the patent subject only to the obligation to pay royalties to the employee inventor. In marking the distinction between these types, the regulation stated that "what is included in the service obligations of the employee is to be decided according to the nature of the employee's actual service occupation. It is part of the employee's duties, over and above the narrower scope of his immediate service occupation, to safeguard the interests of the organization and call attention to shortcomings and possible improvements."

In the SSW plant the practice was when an employee made any invention—shop, service or free—he reported it to his superior and to the head of the patent department. The three then filed a written notice or report with the company. This report stated in answer to question 9 what classification of the invention—that is, shop invention, service invention or free field invention—was correct in the opinion of each of the three men. Such a classification might be in some cases, especially where there was no disagreement, a permanent and final classification. But where there was disagreement or where the exact classification of the invention could not be cor-

rectly stated until its full nature had been explored by experimentation and use, then the notice or report was not intended to be binding. Almost always (indeed, so far as the testimony indicated, with only one exception) the supervisors and the representatives of the patent department at the outset claimed that every invention by an employee fell either in the shop category or the service category. The reason was that they sought to protect the company's interest and hesitated to make for the company a disclaimer at an early stage.

Working under this system Professor Rudenberg had made some ten to fifty inventions covered by United States patents other than those here involved. He never claimed and does not now claim that any of these other inventions were free inventions, although some of those other inventions presumably yielded royalties in the United States, while the inventions in suit have so far yielded no American royalties. [Wiegand, Dep. 19.] As to all these other inventions Professor Rudenberg accepted either a shop or a service classification. And for his reward he was content with the regular promotions which came to him and one payment of 10,000 reichmarks which he received as a special bounty for an unusually significant invention.

It was against this background that there occurred the inventions underlying the patents at bar. What happened in 1930 and 1931 can now be told. In the fall of 1930 Professor Rudenberg's younger son was stricken with infantile paralysis. The father, deeply concerned about that illness, learned that doctors knew that it was carried by a virus of poliomyelitis, but a virus so small that it could not be studied under the lens of any existing microscope or any microscope which would depend for its operation upon light waves. The trough between light waves was so much larger than the virus that observations were impossible. Thereupon Professor Rudenberg set himself to devise a new type of microscope. First he thought of an X-ray microscope. This proved impractical. And finally he hit upon a microscope based upon electronic principles. It is unnecessary to describe here the principle underlying that electron microscope. It will suffice to say that it starts from the scientific hypothesis that an electron is one-millionth of one-millionth of a centimeter and that a device for showing the movement of electrons can be applied to measure the course of viruses driven in a stream, or, for that matter, to measure other minute objects.

In accordance with what was his usual practice, Professor Rudenberg merely drew certain sketches of this invention. He did not embody it in any material apparatus.

Then on May 27, 1931, he went to see Dr. Fischer who was employed not by SSW but by SH. Dr. Fischer at once indicated that he thought it was an important discovery and probably in the free field. After the conversation had continued for a time Dr. Fischer called into the conference Dr. Abraham—now called Avery—who was in the SSW patent department and who had skill both as an engineer and as a legal draftsman. Dr. Fischer told Dr. Abraham to draw up the specifications and claims for a patent application and to give the matter priority. He also suggested that he should draw up the type of notice or report which always accompanied an invention by an employee. Dr. Abraham understood that the instructions of Dr. Fischer were to protect the interest of SSW and with that in mind Dr. Abraham prepared the notice. In this notice he stated as the representative of the Patent Department that it was his opinion that the invention fell in the service classification. Professor Rudenberg before signing expressed his doubt as to whether he agreed. But Professor Rudenberg felt himself in a literally ambiguous position—he was not only the inventor but so far as this form of notice was concerned he was also the inventor's supervisor or executive. He was called upon to sign and to express an opinion in both capacities. To solve his dilemma and with a scrupulous regard for his employer's rights, Professor Rudenberg in his representative capacity as executive acting for the company stated it was his opinion that the invention belonged in the service category; but in his personal capacity as inventor acting for himself stated no opinion. And instead of signing the document in two places, he signed only once.

I am persuaded that Professor Rudenberg then regarded his invention as being in the free field; that he communicated this view to the only others who in this matter were representatives of the employer, that is, Dr. Fischer and Dr. Abraham; that if they had been called upon as neutrals to decide the issue, they would have agreed with Professor Rudenberg [Wiegand, Dep. 29] but that they felt that until the full limits of the invention had been explored, they ought not to file a disclaimer for their employer; that they did not intend to and did not act finally for SSW; that the type of notice which Professor Rudenberg signed was according to the practice of SSW regarded as a tentative report and not as a contract; and that Professor Rudenberg made no representation or disclaimer upon which SSW could soundly assert that he was estopped, or had waived his rights, or had surrendered them by contract, or abandoned them, or had assigned these rights to another.

The principal motives for Professor Rudenberg's action is signing this notice were to be loyal to his employer and to give his employer a chance to see if the invention developed in a way in which it could be classified as a service invention. His secondary motive was that as a scientist he preferred to be free of the red tape and expense of filing his own patent application, and to allow SSW to assume the burden in the first instance. Moreover, he was not in a financial position at the moment to exploit the invention from a business point of view and for the sake first of science, and incidentally of himself, he desired to see some corporate organization promote the invention.

I therefore find that as of May 27 and 28, 1931, when these preliminary conferences occurred, the invention of the electron microscope was in the free field and was beneficially owned by plaintiff. SSW had never manufactured such an apparatus or anything like it. The list of SSW products in 1931 has nothing which can be stretched to touch even tangentially such an invention. Research in SSW laboratories was not proceeding along the lines of this invention. No executive, employee, customer or correspondent of SSW had suggested such an invention. No steps in the preparation of the invention were performed in the laboratories of SSW. On the contrary, the stimulus for the invention was from the entirely extraneous incident of the paralysis of Professor Rudenberg's son. The work on the invention was performed so far as appears outside of SSW laboratories and working hours. And the invention itself was of a type unsuited to SSW, but more to Zeiss Optical Works and its competitors in optical instruments or after 1936 but not before [Cf. Wiegand, Dep. 18.] to SH or Allgemeine Elektrizitats Gesellschaft (abbreviated as AEG).

It follows that as of May 28, 1931, the plaintiff was the beneficial owner of the invention underlying the patents in suit.

Nothing that happened later that year changed the beneficial ownership of the invention. After Dr. Abraham had drawn the specifications and claims for the German patents on the invention Professor Rudenberg made a few changes in detail. Then application was made to the German patent office—which, because of a competing claim, seems not to have granted any patent. Subsequently SSW paid the plaintiff a nominal consideration of 4 mark 20 pfennige, the equivalent of $1, as a formal token to make an assignment of each of the two parts of the invention. The sole purpose of these assignments was to enable SSW as the formal assignee to apply for the two United States patents in suit.

SSW in due course did make applications for American patents. And in the applications SSW correctly stated that Professor Rudenberg was the inventor of, and the company was the assignee of the legal title to, the inventions. Thereafter the United States Patent Office issued the patents in suit on October 27, 1936, and February 9, 1937, which it is important to note was nearly six years after the invention.

Nothing in the assignments of, applications for, or grants of these patents shows a transfer by Professor Rudenberg of his beneficial ownership in the inventions. The steps he took had a purely formal significance.

Many months passed before the invention received attention. Once in a scientific

meeting an employee of SH read a paper based upon the invention. But at the close of the meeting he told the plaintiff he saw no commercial value or future in the discovery.

In the meantime Hitler and the Nazi regime had come to power. Professor Rudenberg who was not a 100% Aryan as that term is defined in the so-called Nuremberg laws found himself in increasing doubt as to his personal, political and business status and as to his future. Many of his acquaintances in like positions in industry were being let go. The executives of SSW tried to reassure him. Dr. von Siemens, the head of the concern, invited him to confer with him whenever he was in trouble. Once Dr. von Siemens said that Rudolph Hess (the later Deputy Fuehrer) had said after examining Professor Rudenberg's file that he was not in danger. Nonetheless, the situation was disagreeable, if not precarious.

In the summer of 1935 Professor Rudenberg decided to leave. His health was in fact badly affected by worry. He did not know whether he and his family could escape with their lives. And he was uncertain if he would find suitable employment again.

With the intention of leaving Germany, Professor Rudenberg conferred first with Dr. von Siemens and later with two other executives of the firm, Dr. von Witzleben and Dr. Fessel. The upshot of these conversations was that in the friendliest possible spirit toward Professor Rudenberg but with dread of the Nazi regime, these men advised Professor Rudenberg as to what course he should follow if he reached England. They said he should give as a reason for resigning his health; that he should write a letter of resignation from England; that they would do what they could to get him a pension; and that Dr. von Siemens would try personally to help him if he were in need.

Professor Rudenberg went to England and wrote the letters according to plan. There he received from SSW a pension to which he was not legally entitled since he had not fulfilled the conditions precedent of the pension plan. After German exit taxes and other German deductions, some of which were of doubtful legal validity, he received the equivalent of $10,000. This was not intended as, and in fact was not, payment for any inventions in the free field or for Professor Rudenberg's inventions embodied in the patents in suit. It was principally a recognition by SSW of the generally high qualities of his past services and the unfortunate circumstances of his leaving. It may also have involved a final satisfaction of all claims that the plaintiff would have had against SSW on account of patents which they had both *finally* agreed to classify as service inventions. But it had no effect on inventions that were, or might yet be, classified as "free."

In 1936 a representative of SSW, one Dr. Leipersberger, came to London to discuss with Professor Rudenberg the purchase from him of all his interests in patents taken out in the name of SSW for £4,000. This would seem to indicate that as of that date SSW regarded plaintiff as the equitable owner of the electron microscope. Being hard pressed for money, Professor Rudenberg orally agreed to sell; but this contract of sale (even if it be valid under the English Statute of Frauds—which it is unnecessary to decide) was not intended to ripen into a sale, that is, a transfer of title to patents or patent rights, until the money was paid. In fact, the money was never paid. Inquiries made by Professor Rudenberg orally of two officials of Siemens and in writing of others, produced no results. The sale was never consummated and a reasonable time for the performance of the contract has now elapsed.

In the same year, 1936, there were rumors that AEG was developing something like Professor Rudenberg's invention. SSW investigated, but decided not to proceed with manufacture under the patents in suit.

Professor Rudenberg emigrated from England to the United States in 1938. In the year 1939 he became Gordon McKay Professor of Electrical Engineering at Harvard University, a post he still holds. While he was promptly recognized as a scientist of distinction, he did not become immediately adjusted to his new surround-

ings and he had at first no time to devote to such personal claims and such legal rights as he might have. Moreover, he was not aware of the rights he might have. Indeed, he did not clearly have in mind the point that his invention of the electron microscope had been embodied in American patents until one day in 1941 he met Dr. Abraham—by then called Mr. Avery—in New York. Furthermore, mindful of the considerate treatment he had received from his confreres at SSW through many years and particularly at the time he emigrated from Germany, hopeful that the Nazi regime would come to an end and that he might be able to adjust in a friendly fashion his claims against SSW, and knowing that the officials of SSW would not be misled by the delay, Professor Rudenberg took no action to assert his claim to the inventions in suit.

Had Professor Rudenberg filed suit to secure, or had otherwise claimed beneficial ownership in his invention between May, 1931, and January, 1933, he would have been acting precipitately, for until the invention had been materialized in some apparatus and tested, it would have been difficult to establish clearly that it fell outside the scope of service inventions useful in SSW's regular lines of manufacture.

Had Professor Rudenberg, as a partial non-Aryan, filed a suit in Germany after January, 1933, he could not have hoped to prevail against SSW. Had he filed a suit in the United States after 1937 (when the second patent issued), the claim might have required more money, time and documentary evidence than Professor Rudenberg had before 1942—the date of the APC's first relevant Vesting Order. Had Professor Rudenberg aggressively and vigorously, or even in a temperate way, presented his claim to these patents by a letter addressed to SSW at any time after Hitler came to power and before December 8, 1941 (the last date on which communication from the U. S. A. to Germany was permitted), the mere assertion of the claim might well have led to nothing but action by the German government impeding SSW from recognizing the claim.

It can not be correctly said that prior to the outbreak of World War II a prudent, vigilant person would necessarily have acted more contentiously or more explicitly than Professor Rudenberg did to assert ownership of these patents. He knew that SSW had always treated him fairly, and that their officials did not regard him as having *finally* acceded to any classification prejudicial to himself. They were not misled into supposing he thought himself without rights of ownership. He was not lulling them into a false sense of confidence. They were men who would recognize that he was not sleeping on his rights but was in a situation where he could not act without possible danger to himself and to the men of good will in SSW.

After the APC vested these patents, Professor Rudenberg on August 11, 1942, filed his first claim regarding them. At that time he had no lawyer and had consulted none professionally. In the possibly mistaken notion that in the law as in science it is enough to state one's minimum claims and to let the evidence speak for itself, Professor Rudenberg asserted only that "the inventions were considered by my employers as well as by myself as 'Diensterfindungen' (Service Inventions) * * * Since the patents cover a pioneer invention and have considerable economic importance, and were invented by myself without assistance by the firm or other employees, I am entitled, according to par. 5, 1, a of the Bestimmungen, to claim adequate compensation * * *" [that is, on the basis of a service invention]. In short, Professor Rudenberg then claimed only a right to share in the licensing of and royalties on these patents. He failed to allege that he had title or the right to demand title to the patents. However, it does not appear that as of 1942 or 1943 he knew the technical difference between a claim to equitable title and a claim to royalties. This limited 1942 claim by the plaintiff, unadvised by counsel, was not communicated to SSW and was not relied upon by SSW or any one else so far as appears.

On May 8, 1943, Professor Rudenberg filed an amended claim with the APC. In this he claimed, in the alternative, either a property interest in the patents, or a share in the licensing of and the royalties under the patents.

Professor Rudenberg, being a non-Aryan, lost his German citizenship and became stateless on November 25, 1941, by virtue of a decree of the German Reich.

Professor Rudenberg, having been a permanent resident of the United States since October 3, 1938, was naturalized as a United States citizen on March 13, 1944.

Upon the basis of the foregoing facts, I make the following legal conclusions which together show that as a matter of law the plaintiff is entitled to the relief he seeks in these proceedings:

■ 1. Having been a resident in the United States and not a citizen or national of any country at the time of the Custodian's seizures, and having been an American citizen at the time this suit was begun and ever since, Professor Rudenberg was not at any material time either an enemy or an ally of an enemy. He had and has a right to present a claim under § 9(a) of the Trading With The Enemy Act, as amended. 50 U.S.C.A.Appendix, § 9(a).

2. Since the invention of the electron microscope was not within the scope of the categories of shop inventions or service inventions, it belonged at the outset, that is, in 1930 and 1931, to plaintiff and not to SSW. This would be the result regardless of whether German or American law be applied.

■ 3. Plaintiff did not assign or transfer the beneficial interest in the invention either when he filled out the SSW report form in May, 1931, or when he executed the formal assignments preliminary to the application for the United States Letters Patent. This likewise would be the result regardless of whether German or American law be applied. The law of both countries recognizes that the document first referred to was not executed by Professor Rudenberg in his individual capacity; was a mere temporary report or record; and was not regarded by anyone as being an actual or potential contractual commitment or transfer of property. The other documents, that is, the assignments for which 4 mark 20 pfennige each were paid, were mere transfers of bare legal title to enable SSW to take legal steps in the United States for whoever might be the beneficial owner.

■ 4. When plaintiff filled out the SSW report form in May, 1931, and when he executed the formal assignments preliminary to the application for the United States Letters Patent, the result under American law was that SSW held the bare legal title to the inventions and patents as constructive trustee. "Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises." Restatement, Restitution, § 160. Compare 3 Scott, Trusts, § 462.4. This principle has been applied in favor of an employee who made an invention in a situation analogous to the one at bar. Howard et al. v. Howe, 7 Cir., 61 F.2d 577, 579. And I am persuaded that a similar equitable obligation exists under German law, although that law, so far as I am advised, might not use the Anglo-American concept of a trust or the nomenclature of a constructive trust to enforce the equitable obligation.

■ 5. Plaintiff did not lose his beneficial interest in the invention or his right to enforce the constructive trust by allowing SSW to continue to hold the legal title. There were good grounds known to and appreciated by the representatives of SSW why the plaintiff never pressed SSW for a transfer to him of the legal title to the patents. These reasons included: (1) An original willingness of plaintiff's part to allow SSW to make certain (or what ultimately was clearly proved) that the invention was not within the scope of SSW's activities; (2) an original willingness to allow SSW to promote and exploit the invention, without acquiring ownership, on a mutually shared expectation that if the invention should prove practical some satisfactory adjustment would eventually be worked out; (3) a recognition by all concerned that after Hitler came to power the time was not appropriate for SSW to transfer legal title to plaintiff as that would cause difficulties certainly for plaintiff and probably for SSW; and (4) the view, shared by plaintiff and SSW, that all par-

ties, in view of their past dealings, and, without prejudice to themselves, could leave matters in status quo ante and could put off the day of reckoning until after the Nazi regime fell. In short, there was no misleading of SSW; no lulling of them into false confidence; and no prejudicial delay.

6. Thus, there was not, under doctrines of either German or American law, a basis for concluding that plaintiff had by estoppel or by laches lost his equitable title. For neither legal system would apply the bar of estoppel in a case where there was no representation by an equitable owner that he was abandoning ownership and where there was no reliance or change of position by a holder of the legal title based on the beneficial owner's representation of abandonment. Restatement, Restitution, § 178; Scott, Trusts, § 480. And neither legal system would apply the bar of laches in a case where both the equitable owner and the holder of the legal title regarded it as to their mutual interest to leave their respective interests in a vague but friendly posture rather than to sharpen those rights by presenting them in adversary fashion either by formal claims or by litigation. Restatement, Restitution, § 179; Scott, Trusts, § 481.1; Howard v. Howe, 7 Cir., 61 F.2d 577, 580; Rajah Auto Supply v. Belvidere Screw & Machine Co., 7 Cir., 275 F. 761, 765.

7. Since neither German or American law would defeat plaintiff's claim by doctrines of contract, of assignment, of estoppel or of laches, it is unnecessary to decide which law governs. Indeed, possibly different law governs different aspects of the case.

8. Plaintiff, not having lost his beneficial interest prior to August 11, 1942, did not lose it on that day by filing with the Alien Property Custodian a claim which recited plaintiff's rights were based on a service invention. That claim was filed without benefit of counsel. It was never drawn to the attention of SSW. Indeed, it represents nothing more than an inadequate first presentation by a layman of what he supposed to be his rights. It was modified as soon as competent counsel was employed and before any one had acted on it. A statement made under such circumstances is of course admissible as evidence [Cf. United States v. Rizzo, 297 U.S. 530, 533, 56 S.Ct. 580, 80 L.Ed. 844] but it need not be, and in this case is not, a basis of a binding estoppel precluding recovery. Compare Reynolds v. Adden, 136 U.S. 348, 351-353, 10 S.Ct. 843, 34 L.Ed. 360; City of Owensboro v. Owensboro Water Works Co., 243 U.S. 166, 173, 174, 37 S.Ct. 322, 61 L.Ed. 650. See IV Wigmore, Evidence, §§ 1057-1059.

9. Plaintiff having retained his full equitable ownership is entitled to a conveyance by the defendant not only of that but also of the bare legal title to the two patents in suit. Standard Oil Co. v. Markham, D.C., S.D.N.Y., 64 F.Supp. 656, 670, 671. See Pilger et al v. Sutherland, 61 App. D.C. 84, 57 F.2d 604, 606. Compare Restatement, Restitution, §§ 4(c) and 160, comment e.

Decree of ouster le main to be entered in accordance with opinion.