**DICKINSON v. BURNHAM et al.**

No. 9, Docket 21960.

United States Court of Appeals Second Circuit.

Argued April 9, 1952.

Decided June 24, 1952.

Solomon Kaufman, New York City (Melville Hall and Samuel Hershenstein, both of New York City, on the brief), for Albert G. Dickinson, plaintiff-appellant.

James A. Vaughan, New York City, for E. Lewis Burnham and James A. Vaughan et al., interveners-defendants-appellees.

Satterlee, Warfield & Stephens, New York City, for Estate of Marshall P. Slade, intervener-defendant-appellee.

Wickes, Riddell, Bloomer, Jacobi & McGuire, New York City, for Estates of George B. Agnew and Robert H. Neilson, intervenors-defendants-appellees.

Before CHASE, MARIS and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The lengthy litigation which should be brought to final termination by the disposition of this appeal began in 1938 with an action brought by the plaintiff in the district court below to impress an equitable lien upon certain stock of Petroleum Conversion Corporation. The defendants then named were Arthur W. Rinke and others constituting a Stockholders' Committee of the corporation; the stock itself stood in the name of defendant Fred B. Lloyd. In 1942 the district court dismissed the complaint, but, on appeal, this court reversed and remanded the action for a new trial. Dickinson v. Rinke, 2 Cir., 132 F.2d 805. It also reversed an order (made after the appeal had been taken) holding certain persons in contempt for removing the stock from the jurisdiction. Dickinson v. Rinke, 2 Cir., 132 F.2d 884. Following remand, the Petroleum Conversion Corporation and E. Lewis Burnham and James A. Vaughan— the latter two suing on behalf of themselves and a class they assumed to represent— intervened. Both interests sought the cancellation of the stock on the basis of fraud in its issuance and, as well, the recovery from Dickinson and Lloyd of $87,310.28 secret profits fraudulently realized some fifteen years previously from a fund established by a number of Petroleum stockholders to aid the corporation in its then financial difficulties. After trial to the court and on October 17, 1946, the district court dismissed the claims of plaintiff Dickinson and defendant-intervener Petroleum Conversion Corporation and, after amending certain findings of fact increasing the amount subject to claim to $176,245.24, entered an interlocutory decree in favor of the class interveners against Dickinson and the estate of Lloyd, then deceased.

This decision settled against them the factual issues as to the conduct of Dickinson and Lloyd. The court, however, deferred final judgment pending notice and opportunity to other members of the class

to intervene and share in the judgment. Thereupon some eighty-three motions to intervene were made and granted, of which thirteen subsequently were withdrawn. The court denied the plaintiff's claim, then made for a trial by jury, as well as his request for the taking of depositions as to the new claims and his motion to dismiss the counterclaim for lack of an indispensable party. After hearing the claims of the two original and seventy additional interveners, the court, over vigorous procedural objections by Dickinson, entered final judgment in their favor for $408,949.57, being $176,245.24, plus interest.[1]

Plaintiff Dickinson, defendant Public Administrator of New York County (acting as administrator of Lloyd's estate), and defendant-intervener Petroleum Conversion Corporation thereupon appealed. Plaintiff's motion to dismiss the Petroleum appeal, denied by this court, Dickinson v. Mulligan, 2 Cir., 173 F.2d 738, was ordered reversed by the Supreme Court, Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 70 S. Ct. 322, 94 L.Ed. 299. Hence only Dickinson, the Lloyd estate, and the class of interveners have any interest in the case as it comes before us. While the interest of the Lloyd estate is before us on the appeal taken by the Public Administrator (formerly James F. Egan, now Francis J. Mulligan), he has not filed a brief or participated in the argument, but has left this burden to Dickinson.

Dickinson's appeal raises important questions both substantive and procedural. As to the merits of the counterclaim, he has taken issue with a series of the findings by the district court and proffers, instead, an exculpatorily innocent interpretation of the events, skillfully woven from the documentary and uncontroverted evidence, on which he bases a claim of error in the findings. We are unable, however, to find grounds for holding these findings "clearly erroneous" under F.R. 52(a), 28 U.S.C.A.

The relevant facts as stated by the district court are as follows: Knox Process Corporation, the predecessor of Petroleum Conversion Corporation, was organized under the laws of Delaware in 1923 with an authorized capital stock of $3,000,000. It was designed to exploit certain petroleum cracking patents then in the experimental stage and to this end it purchased two parcels of land of about 143 acres in Texas City, Texas, in December, 1923. Shortly thereafter construction was begun on a cracking plant which was completed the following year. The land, the plant—which in fact never proved commercially successful —and the patents were the sole assets of the corporation in the beginning of 1925.

By February, 1925, however, a number of mechanics' liens had been filed against the plant. In order to acquire these liens and free the plant, a capital-raising device was needed which could be kept separate from the corporation. The device finally agreed upon was the "Arthur W. Rinke Agency," organized in the latter half of 1924 and ratified by a resolution of the Knox Board, February 26, 1925. Though Rinke, an attorney interested in the affairs of the corporation, acted as administrator of the Agency fund, its guiding spirit was actually Fred B. Lloyd, a Knox officer.

The Rinke Agency began immediately to solicit subscriptions among the Knox stockholders. The first three of its campaigns were carried on under agreements with the subscribers wherein it was stated that the purpose of the Agency was to acquire the liens on the Texas City plant; the last two series of agreements authorized Rinke to apply the funds to the acquisition of any property of Knox Process—which had meanwhile been reorganized in 1926 as the Petroleum Conversion Corporation, also a Delaware company. The subscribers were promised repayment in the form of shares of Knox, later and after it was reorganized Petroleum Conversion, in an amount of a par value equivalent to their subscriptions.

By November, 1926, some $600,000 had been collected from interested investors fearful that the venture would lose its most important asset, the plant. Though Rinke has never been able to account for all the funds, it appears certain that about a third were paid directly to Lloyd and Dickinson.

---

1. The court's reasoned opinion appears to be reported (albeit with certain omissions) only in 11 Fed.Rules Serv. 489, and see also id. 885.

Sometime prior to the reorganization of Knox in 1926 the latter had decided to exploit the lien threat to their own advantage through the Rinke Agency. The plan was simple enough: Dickinson was to purchase the plant at the lien foreclosure sale for one-half the face amount of the liens, $87,310.28, and resell it for the full amount of $174,620.56.

Hence in December, 1925, when the lien creditors secured a judgment in their favor and an order of sale of the plant and its fifty acres of land, Lloyd submitted a bid of $87,310.28, plus 18,000 shares of Knox stock at $5 par, or $90,000 par value, on behalf of Dickinson. And when the latter paid the stated price in cash—apparently the stock was never issued or received by the lien creditors—he received the deed to the plant from the master. Needless to say, ownership of this strategic property put Dickinson in a commanding position; and so the Rinke Agency, under Lloyd's aegis, proceeded to reimburse him. Between January 25 and September 7, 1926, he received the first $87,310.28, plus interest, and, from September 14 to December 10, 1926, a similar amount, which he divided with Lloyd. Neither the fund subscribers nor the corporation's officers were aware of these disbursements until 1938.

Rinke, meanwhile in early 1926, had also been appointed agent for the Knox Bondholders Protective Committee and acquired the remaining 93 acres of real estate and the patent rights that comprised the rest of the Knox Corporation assets. On December 7, following the formal organization of Petroleum Conversion, Lloyd, now acting on behalf of the corporation, offered to purchase the patents and land held by Rinke for 590,000 shares of Petroleum stock, $5 par. He concurrently offered Dickinson 609,600 shares in exchange for the cracking plant and fifty acres of land. Dickinson had continued to hold the deed in spite of the disbursements from the Rinke Agency fund to him and thus was able to consummate the transaction. Lloyd, however, continued to hold 140,000 shares, as well as the stock designed for the Rinke Agency under the offer to the latter, until he disappeared in 1936.

The district court held Dickinson liable to the Rinke Agency subscribers for the full amount of the payments received by him therefrom. It also held the Lloyd estate jointly and severally liable with Dickinson, a judgment practically collectible only from the latter. Plaintiff objects strenuously, however, that this conclusion is against the weight of the evidence. Though tacitly accepting the facts that the subscribers were informed that the fund was to be used to acquire either the liens or the Knox assets, that instead it was used to pay him, that the subscribers did not concurrently receive the stock to which they were entitled, and that he nonetheless continued to hold the plant until the Petroleum stock-exchange offer, he nevertheless contends that the transaction was carried on in a way entirely fair to those who subscribed to the Agency. For this proposition he cites the financial experience of those who claimed to have been duped and the failure of the alleged conspirators to cover their tracks by destroying checks and records. He contends that the subscribers had notice of his purchase of the plant. And finally he argues that the transaction was equitable in that he profited solely for risking his capital at a time when the Knox investors were unable to do so, and hence that the subscribers somehow received their due under the agreements.

These assertions are insufficient to overturn the district court's findings. Especially in litigation where the issues are singularly complex and the evidence adduced unusually voluminous ought the determinations of the trial court serve as direction and guidance for appellate review. As a matter of fact there seems little of substance, aside from what Dickinson says as to his own contemporary state of mind and the claimed equity of the transaction to all concerned, that points at all to a contrary interpretation of the facts. That Dickinson and Lloyd conspired to secure the plant for themselves, that they thereafter paid themselves from the fund, that its subscribers were without notice of this payment and in fact had subscribed under agreements specifying other uses to which their money was to be put, and that they

received no benefit, seems quite certain from all the evidence. Under the now firmly established interpretation of the "clearly erroneous" rule of F.R. 52(a), we are clear that the findings on the merits must be sustained. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Yellow Cab Co., 338 U.S. 338, 341, 342, 70 S.Ct. 177, 94 L.Ed. 150; United States v. Oregon State Medical Society, 343 U.S. 326, 339, 72 S. Ct. 690.

There remain for consideration a considerable number of questions of law and procedure. The most important of these arise out of the action of the district judge in upholding the class-suit device, F.R. 24, in this situation and amplifying it to work out a complete and final adjudication of the matters before him. Overruling the jurisdictional and procedural objections to its use raised by plaintiff, the judge then followed a course often suggested elsewhere and specifically advanced by us in York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 529, reversed, but on another point, in Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231. This was a procedure for bringing in other persons interested in the recovery to share in it.[2] In his interlocutory judgment adjudicating the merits and making findings thereon, the judge reserved jurisdiction of the class claim and directed that all subscribers to the fund be informed of their privilege to appear and take part in the recovery. Thereafter Burnham and Vaughan, as class representatives, sent notices and appropriate claim forms to each of the 159 subscribers at their best last known addresses by registered mail, return receipt requested. Of these, 83 subsequently intervened with claims aggregating $441,-832.50, or about two-thirds of the total fund; 32 received notice, but failed to file the appropriate applications for their claims in the amount of $75,210; and 32 more with claims of $80,500 were not located, the

registered notices having been returned. Of the 83 motions to intervene, 13 were withdrawn; of the remaining 70, 43 appeared in their individual capacity as original subscribers to the Rinke Agency or as transferees, while 27 filed claims as executors, administrators, trustees, sole heirs, or legatees of the estates of such subscribers. Proof of capacity was then had on such documentary evidence as wills, trust indentures, or letters of administration; and application to intervene was granted and a final decree entered on August 3, 1948, awarding the total amount of the appropriated $176,245.24, plus interest, to the 70 subsequent claimants and Burnham and Vaughan.

The district judge stated the formula of recovery which he applied thus: "A final decree should be entered according to each intervener claimant, including Vaughan and Burnham, a judgment against Dickinson and against Lloyd's estate jointly and severally, in an amount which shall bear the same ratio to $176,245 and interest * * * as the amount of the intervener's claim bears to the total of the claims of the interveners allowed by the Court." The decree carrying out this disposition of the fund also provided that "each Rinke Agency subscriber, his legal representatives, successors and assigns, to whom notice of the right to intervene in this proceeding was mailed pursuant to the order of this Court and who did not apply to intervene and prosecute his claim herein, is barred from hereafter asserting any claim against the plaintiff, Albert G. Dickinson, or the Estate of Fred B. Lloyd, deceased, based on any Rinke Agency subscription." But in reaching his conclusion the judge had stated, with considerable amplification, that what he had before him was "a spurious class action" within subdivision (3) of F.R. 23 (a). By making use of this euphonious, if mystic, label, the judge has let himself in for a considerable amount of trouble. For the procedural aspects of this appeal are

2. See, e. g., Bogart v. Southern Pac. Co., 2 Cir., 290 F. 727, certiorari denied 263 U.S. 708, 44 S.Ct. 36, 68 L.Ed. 517; National Hairdressers' & Cosmetologists' Ass'n v. Philad Co., D.C.Del., 41 F.Supp. 701, affirmed 3 Cir, 129 F.2d 1020; and the text authorities cited note 4 infra. But cf. criticism, as applied to the "spurious" class, in 3 Moore's Federal Practice ¶23.12, 2d Ed. 1948.

made to turn largely upon arguments and deductions drawn from this observation.

The convenient use of the appellations "true," "hybrid," and "spurious" for determining the effect of a judgment in a class suit under F.R. 23(a) has become rather general; but these labels should not be pressed so far as to obscure the original meaning and purpose of the rule itself. A usual diagnosis has been that as distinguished from the "true" class suit under subdivision (1), where the representatives truly bind the class, and the "hybrid" group under (2), where, although the rights are several, yet "the object of the adjudication of claims which do or may affect specific property involved in the action," is the "spurious" class suit under (3), which is said to be only a joinder device where common questions of law or fact are involved and a common relief is sought. So it is concluded that in this latter case the rights of those not present are not bindingly adjudicated, as distinguished directly from the first subdivision, and partially from the second where the court's control of the property is absolute and dispositive.[3]

■ It should be stated that these views are not everywhere accepted in full or to the extent thus stated. Specifically there has been strong support, notably by leading text writers, for the view that where adequate steps to notify and bring in all those in interest have been taken—as here—the judgment even in the third group may have a more decisive and binding effect. The emphasis is thus shifted from the nature of the right to the due process accorded in the individual case. This is urged as being both within constitutional principles and as necessary and desirable to add vitality and effectiveness to the class-suit device.[4] This approach appears to have appealed to the New York Judicial Council, which in its current proposal for amendment and expansion of N. Y. C. P. A. § 195 provides for the giving of notice or imposing of other terms to protect the interests of absent persons, but with ultimate "power to limit the effect of the judgment to the parties before the court, if despite the broad powers given by the proposed statute the conduct of the litigation or the facts brought out therein are such that it would not be fair to bind the absentees." 18th Rep.N.Y.Jud. Council 244, 1952, and see generally id. 80, 217–249. But we need not attack that interesting problem here. Our question is not the effect as *res judicata* of the judgment entered, but how far Dickinson can object to a transfer of the entire fund from his hands. As to this specific question we are quite clear that the present suit falls neatly within subdivision (2) of the rule, dealing with the disposition of a fund, and that the court had full power to deal with it as it did, acting with great care and most equitably. Obviously its solution was an eminently practical one; it declined to allow the wrongdoers to escape for some theoretical

3. Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387, 390, referring to "the settled rule in the Second Circuit"; California Apparel Creators v. Wieder of Calif., 2 Cir., 162 F.2d 893, 174 A.L. R. 481, certiorari denied 332 U.S 816, 68 S.Ct. 156, 92 L.Ed. 393; Central Mexico Light & Power Co. v. Munch, 2 Cir., 116 F.2d 85; Redmond v. Commerce Trust Co., 8 Cir., 144 F.2d 140, certiorari denied 323 U.S. 776, 65 S.Ct. 187, 89 L.Ed. 620; Pentland v. Dravo Corp., 3 Cir., 152 F.2d 851; Farmers Co-op. Oil Co. v. Socony-Vacuum Oil Co., 8 Cir., 133 F.2d 101; 3 Moore's Federal Practice ¶23.11, 2d Ed. 1948; Note, 55 Yale L.J. 831, 1946. But see Weeks v. Bareco Oil Co., 7 Cir., 125 F.2d 84; National Hairdressers' & Cosmetologists' Ass'n v. Philad Co., supra; and note 4 infra.

4. Kalven & Rosenfield, The Contemporary Function of the Class Suit, 8 U. of Chi. L.Rev. 684, 1941; Keeffe, Levy & Donovan, Lee Defeats Ben Hur, 33 Corn.L.Q. 327, 1948; Gordon, The Common Question Class Suit under the Federal Rules and in Illinois, 42 Ill.L.Rev. 518, 1947; Note, Federal Class Actions: A Suggested Revision of Rule 23, 46 Col.L. Rev. 818, 1946; and see Richardson v. Kelly, 144 Tex. 497, 191 S.W.2d 857, certiorari denied 329 U.S. 798, 67 S.Ct. 487, 91 L.Ed. 683. The well-known statement of Chief Justice Stone in Hansberry v. Lee, 311 U.S. 32, 40, 41, 42, 61 S.Ct. 115, 85 L.Ed. 22, supports the constitutional sufficiency of a judgment based on notice.

protection to or against persons who after all these years and having failed to respond to notice were surely not actually disposed to claim participation. By taking charge of the fund as it did, it afforded all necessary protection to the plaintiff while making a fair distribution to the actual parties in interest. And the result seems not merely practical, but legally sound.

For what we have here is property held in constructive trust by reason of fraud perpetrated upon those who made the original contributions. It is, indeed, vigorously asserted that unjust enrichment alone is a sufficient basis for the operation of the legal principle. Be that as it may, it is at any rate axiomatic that with fraud there are adequate grounds for the relief of either damages or specific performance, as may be most appropriate and effective. Restatement, Restitution § 160, 1937; 3 Scott on Trusts § 462.3, 1939; 4 Pomeroy, Equity Jurisprudence § 1044, 5th Ed. 1941; Central Manhattan Properties v. D. A. Schulte, Inc., of New York, 2 Cir., 91 F.2d 728; Liken v. Shaffer, 8 Cir., 141 F.2d 877, certiorari denied 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 605; Rudenberg v. Clark, D.C. Mass., 72 F.Supp. 381; Coane v. American Distilling Co., 298 N.Y. 197, 81 N.E.2d 87; Reynolds v. Stevens, 66 R.I. 220, 18 A.2d 637; Pound, The Progress of the Law, 33 Harv.L.Rev. 420, 421. And it is also quite clear, as the Third Circuit has pointed out, that the disposition of a fund held in constructive trust comes within the "hybrid" class, so that claims by non-appearing members can no longer be asserted against the original holders who are forced by the judgment to disgorge. Pennsylvania Co. for Insurance, etc. v. Deckert, 3 Cir., 123 F.2d 979, 985; 3 Moore's Federal Practice 3441, 3468, 2d Ed. 1948. As a matter of fact, the necessary application of this principle is well illustrated here by the fact that the court, with the approval of all, has limited recovery to the funds received by plaintiff. Although none of the contributors has been paid in full, no one, and certainly not the plaintiff, now asserts or suggests that they should have full recovery from him as on an ordinary tort liability for conspiracy and defrauding. The court's power of disposition over the fund was therefore absolute and final. Leadville Coal Co. v. McCreery, 141 U.S. 475, 12 S.Ct. 28, 35 L. Ed. 824; Richmond v. Irons, 121 U.S. 27, 66, 7 S.Ct. 788, 30 L.Ed. 864.

With this disposal of perhaps the most interesting problem of the appeal, we can pass rather quickly over other objections raised in the appeals from either the two judgments or the intermediate orders. Filing of the counterclaim was quite proper. Burnham and Vaughan having sought permissive intervention, the only question as to the court's discretion was "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." F.R. 24(b). Thereafter a permissive counterclaim was open to any party. F.R. 13(b); U. S. ex rel. Foster Wheeler Corp. v. American Surety Co. of New York, 2 Cir., 142 F.2d 726, 728; Comm., 3 Fed.Rules Serv. 685; 4 Moore's Federal Practice ¶ 24.17, 2d Ed. 1950. Obviously complete settlement of this long pending dispute was desirable and in the interest of justice. The court found the diverse citizenship of the original parties and the interveners Burnham and Vaughan. This is sufficient for our purposes. Townsend v. Bucyrus-Erie Co., 10 Cir., 144 F.2d 106, 108. And it gave jurisdiction for adjudication of the issues between the class and the plaintiff and his co-conspirator, irrespective of citizenship of the subsequent interveners; the later distribution of the fund was merely an ancillary step in administration. 3 Moore's Federal Practice 3443, 2d Ed. 1948; Clark, Code Pleading 406, 2d Ed. 1947. The counterclaim fairly stated a claim in excess of the jurisdictional amount, asserting that the amount in dispute was $87,310.28 fraudulently extracted from a fund to which Burnham had contributed $15,000 and Vaughan $24,250. Later increase in the amount found due and awarded is of course quite within the rules. F.R. 54(c); Gins v. Mauser Plumbing Supply Co., 2 Cir., 148 F.2d 974, 976, and cases cited; Bowles v. J. J. Schmitt & Co., 2 Cir., 170 F.2d 617, 621.

Plaintiff's claim for a plenary trial on the right of each intervener coming in after the interlocutory judgment, includ-

ing the taking of depositions and a jury on each, was properly overruled. Plaintiff had already had his day in court as to his general liability; he could not relitigate his duty to the class as a whole. Left only was the question of "essentially supervisory jurisdiction over the distribution among the class" of those entitled to the fund. Dickinson v. Petroleum Conversion Corp., supra, 338 U.S. 507, 515, 70 S.Ct. 322, 94 L.Ed. 299. This could properly be tested in the main by affidavit of claim; until plaintiff showed some doubt that an individual had actually contributed to the Rinke Agency fund there was nothing to contest. Nor was there any right to a jury in the fixing of rights *inter se* in this device coming straight from equity. Clark, Code Pleading 396–398, 2d Ed. 1947; Stewart v. Dunham, 115 U.S. 61, 5 S.Ct. 1163, 29 L.Ed. 329. Rinke (over whom jurisdiction had not been secured) was clearly not an indispensable party, but only another recreant fiduciary and joint tort-feasor. And the release given by the class to Rinke in 1938 cannot avail Dickinson and Lloyd, as to whom it was wholly gratuitous. United Fruit Co. v. United States, 1 Cir., 186 F.2d 890; 2 Restatement, Contracts § 402, 1932.

Finally the court properly held the defense of the statute of limitations unavailing. Under N. Y. C. P. A. § 48, subd. 5, an action for "fraud" may be brought within six years after its discovery. Here Burnham and Vaughan had shown inability to discover the facts earlier, Mason v. Henry, 152 N.Y. 529, 46 N.E. 837, and fraud was an obvious basis of the suit. Subscribers were secured for the Rinke Agency fund on the basis of statements as to the use to which their subscriptions were to be put. The statements were false; the funds were actually used for the personal profit of Dickinson; and this misappropriation harmed the claimants. All elements of fraud were present. Seneca Wire & Mfg. Co. v. A. B. Leach & Co., 247 N.Y. 1, 159 N.E. 700; Urtz v. New York Cent. & H. R. R. Co., 202 N.Y. 170, 95 N.E. 711. So each further intervener took *prima facie* the dates open to his representatives. York v. Guaranty Trust Co., supra, 2 Cir., 143 F.2d 503, 528–529. Though plaintiff might

have controverted this presumption by affidavit showing "special facts" as to a particular claimant, there appeared "no substantial dispute" that any of the class was thus individually barred. Flynn v. Royal Development Co., Sup., 37 N.Y.S.2d 640, 641, affirmed 265 App.Div. 592, 40 N.Y.S.2d 418.

Affirmed.