372 F.2d 155
 Joseph CARROLL, Charles Peterson and Charles Turecamo, as Treasurer, Orchestra Leaders of Greater New York, Plaintiffs-Appellants,
v.
AMERICAN FEDERATION OF MUSICIANS OF the UNITED STATES AND CANADA, Herman D. Kenin, as President of said Federation, Stanley Ballard, as Secretary of said Federation, and George V. Clancy, as Treasurer of said Federation, Associated Musicians of Greater New York, Local 802, and Al Manuti, as President of Local 802, Max L. Arons, as Secretary of Local 802 and Hi Jaffe, as Treasurer of Local 802, Defendants-Appellees.
 No. 75.
 No. 76.
 Docket 30445.
 Docket 30446.
 United States Court of Appeals Second Circuit.
 Argued November 28, 1966.
 Decided January 30, 1967.
 
 COPYRIGHT MATERIAL OMITTED Godfrey P. Schmidt, New York City, for plaintiffs-appellants.
 Emanuel Dannett, New York City (McGoldrick, Dannett, Horowitz & Golub, New York City, for appellees American Federation of Musicians of United States and Canada, Herman D. Kenin, Stanley Ballard and George V. Clancy; Ashe & Rifkin, New York City, for appellees Associated Musicians of Greater New York, Local 802, Al Manuti, Max Arons and Hi Jaffe; Henry Kaiser, Washington, D. C., Jerome H. Adler, David I. Ashe, New York City, George Kaufmann, Washington, D. C., and Eugene Mittelman, New York City, on the brief), for defendants-appellees.
 Before FRIENDLY, SMITH and ANDERSON, Circuit Judges.
 ANDERSON, Circuit Judge.
 
 
 1
 Plaintiffs-appellants are orchestra leaders, who in a series of suits over the past several years, have challenged the legality of numerous activities and regulations of the appellees.[1] The present actions instituted by appellants, Peterson and Carroll, in which Ben Cutler and Marty Levitt were allowed to intervene, as claimed class actions on behalf of themselves and as representatives of other orchestra leaders, charged the American Federation of Musicians and its New York affiliate, Associated Musicians of Greater New York, Local 802, with nine separate violations of the anti-trust laws, none of which is protected by either the Clayton Act[2] or the Norris-LaGuardia Act.[3]
 
 
 2
 The first complaint was filed in July, 1960 and the other, brought to include a challenge to an increase in the musicians' wage scale adopted after the July suit was started, was filed in December, 1960. Both actions sought preliminary and permanent injunctive relief, as well as treble damages for alleged injuries. The district court, sitting without a jury after a trial of five weeks, dismissed the complaints and entered judgment for the defendants. Carroll v. American Federation of Musicians, 241 F.Supp. 865 (S.D. N.Y.1965). The appeal to this court presents the question of whether various practices of the unions violate the Sherman Act.[4]
 
 
 3
 The American Federation of Musicians, an affiliate of the AFL-CIO, consists of 683 local unions and has a membership of more than 260,000. Almost all of the musicians in the United States, referred to in the trade as sidemen, and most of the orchestra leaders and sub-leaders, who act as substitute orchestra leaders, are members of the Federation or its locals. Local 802, with 30,000 members, has virtual control of labor in the music industry in the New York area. The appellants were members of Local 802 when this action was brought, but Carroll and Peterson have been expelled from membership since that date.
 
 
 4
 Essential to an understanding of the issues presented is a definition of terms and a description of the practices which distinguish the industry.
 
 
 5
 Musical engagements are generally classified as either "steady," those lasting for longer than one week, or "single," usually one day or one performance affairs but including all engagements lasting less than one week. The much sought after steady engagements are rare in comparison with the number of single engagements.
 
 
 6
 The predominate form of single engagement is the "club date," such as weddings, parties and dances, which provides employment for the largest number of musicians. Single engagements also include the "non-club date" field, consisting of television appearances or recording engagements, etc. The distinction between the kinds of single engagements is vital; the non-club date engagements are ordinarily governed by collective bargaining agreements concluded by the union and the "purchaser" of music. The same is usually true of the steady engagement field. Local 802 has collective bargaining agreements with the major users or "purchasers" of live music within its area such as recording companies, hotels, television and film producers, opera companies and theatres. These agreements treat the "purchaser" as the employer and the orchestra leader as its employee, little different from a sideman. Indeed, in this field such a characterization would ordinarily be justified, because in the recording industry, for example, in which all engagements are governed by such collective bargaining agreements, a regular employee of the recording company exercises general supervision over the orchestras hired. He selects the orchestra leader, who does the conducting and some arranging, hires the sidemen and determines their number, their instruments and the compositions to be played and exercises general control over the orchestra's performance. The recording company pays each musician, as well as the orchestra leader, individually and is responsible for the withholding of social security, federal and state taxes, as well as all bookkeeping. The practices are similar in most engagements covered by the union's collective bargaining agreements.
 
 
 7
 The club date field is entirely different in that it is not governed by collective bargaining agreements. Rather, the orchestra leader secures the engagement, either by himself or through booking agents and negotiates directly with the music purchaser, usually for a flat price, and the responsibility for collecting the fee, paying the sidemen, withholding taxes and keeping records is his. His remuneration is the difference between his costs, primarily the wages of sidemen, and the amount received from the music purchaser. The district court assumed, without explicitly finding, that orchestra leaders are employers or independent contractors when operating in this field. In light of the fact that an orchestra leader working a club date is no different from any other independent contractor, who employs his own laborers, we conclude, as we have in other contexts in this litigation, see, e. g., Cutler v. American Federation of Musicians, 316 F.2d 546, 549 (2 Cir. 1963), affirming 211 F.Supp. 433, 445 (S.D.N.Y.1962); Carroll v. American Federation of Musicians, 295 F.2d 484, 486 (2 Cir. 1961); Carroll v. Associated Musicians, 284 F.2d 91 (2 Cir. 1960), affirming 183 F.Supp. 636 (S.D.N.Y.1960), that orchestra leaders are employers in the club date field.
 
 
 8
 It should not be inferred, however, that orchestra leaders are a homogeneous class. Some of them act only as orchestra leaders, a few of whom employ more than one orchestra at a time. When the leader is not with his orchestra, he employs a sub-leader as his substitute. Others work only part-time in this capacity, accepting whatever engagements they can find, and work as sidemen or sub-leaders the rest of the time. Still others work as orchestra leaders part-time and are regularly employed outside of the music industry. While the majority of leaders' engagements are in the club date field, they also seek engagements outside of it, either in the single or steady date field. Obviously there is a great deal of fluidity in the industry. Very few orchestra leaders employ their own orchestras full-time. The normal practice is for an orchestra leader first to secure an engagement, determine how many sidemen will be needed, and then employ them through the union hiring hall.
 
 
 9
 Most engagements are secured through booking agents, who since 1936 have been regulated by the Federation and its local unions, because during the depression booking agents took advantage of the job shortages in the music industry by charging exorbitant commissions. Under present union by-laws, union members are forbidden to accept engagements from booking agents not licensed by the union. The licensing agreements limit the commissions of booking agents to 10% for steady engagements and 15% for single engagements; and the agents must agree not to book non-union orchestras for engagements at less than the union scale. In the past, engagements were also secured through the owners of catering halls and their employees, for which the caterer received a commission. Present union by-laws forbid this practice.
 
 
 10
 The Federation exercises rigid and monolithic control over much of the music industry, and this is especially true of Local 802 in the New York area. Within the jurisdiction of the Local, the closed shop is enforced by numerous by-laws, and pressure is placed upon orchestra leaders in various ways to induce them to become union members. For example, union members are not permitted to work in an orchestra in which a non-member leader either conducts or plays or which bears the name of a non-member.[5] A non-union orchestra leader may thus operate only if he hires sub-leaders to conduct. This is the situation of both Carroll and Peterson since their expulsion from the union. There are further restrictions which prevent union members from playing for proscribed or "unfair" persons, for instance an orchestra leader who has employed non-union musicians.
 
 
 11
 Having achieved a virtual closed shop, Local 802 regulates the club date field in great detail. Under its by-laws, member orchestra leaders are required to follow the "Price List Booklet," which is actually a codification of the standing resolutions of Local 802's Executive Board, and it governs all musical engagements not subject to any of the local's outstanding collective bargaining agreements. The booklet characterizes orchestra leaders as employees — "personnel managers" — and refers to the purchaser of music as the employer. It contains resolutions which establish the minimum number of sidemen required and the wage scales for the sidemen and sub-leaders in all engagements covered by it, providing with considerable specificity for variations according to the number of performances, the nature and length of the engagement, the establishment where it is played, and similar details.
 
 
 12
 The price list also sets a minimum for all covered engagements under the title "Regulations for Establishing Leaders' Fees in Single Engagements." These regulations, in fact, establish price floors because the orchestra leader is required to charge the music purchaser not less than the total of his "leader's fees," the sidemen's wages and other fees.[6] The leader's fee is a specific percentage above the union wage scale, graduated according to the number of musicians performing. Price floors are set for both single and steady engagements.
 
 
 13
 As indicated above, the price list is established unilaterally by Local 802. Under its by-laws the Executive Board is authorized to adopt resolutions establishing wages and prices, except where a meeting of the general membership votes on such price list resolutions. Once promulgated, the members must comply with such resolutions. There is no collective bargaining with orchestra leaders concerning the wage scales, price restrictions or other regulations established in the price list. Nor is there any collective bargaining with purchasers of music except, as discussed earlier, in the case of large scale users of music who have standing agreements with Local 802 or with the Federation. Thus, in the club date field, which comprises most of the single engagements, and in many of the steady engagements, terms and conditions of employment, including wages, and minimum prices for orchestral engagements are determined by unilateral action of the union.
 
 
 14
 Enforcement of the regulations promulgated by the Executive Board is achieved by requiring orchestra leaders to report to Local 802 and by insistence upon the use of the Federation's "Form B" contract. This contract form, characterizing orchestra leaders as employees, was adopted by the Federation in 1941, and is the only engagement contract which a member is permitted to sign. The by-laws also provide that such contracts must be submitted for approval to the local union before the performance. Local 802, however, has relaxed these rules for single engagements by accepting an assurance either by telephone, by letter or by a report in person that the agreement with the purchaser complies with all union regulations and provides for payment of the sidemen according to the union wage scale. It insists, in addition, that all engagements as orchestra leaders first be approved by the Executive Board. In order further to assure compliance with the Price List, Local 802 employs "business representatives" who attend engagements to make certain that all regulations are being obeyed.
 
 
 15
 In order to protect the job market for local musicians against the encroachments of musicians and orchestra leaders who do not normally operate in the area, the Federation has instituted additional regulations for traveling engagements, which are those played by orchestras and members outside of the jurisdiction of their respective local unions. Formerly such engagements were sought to be curtailed by a 10% traveling surcharge which orchestra leaders were required to pay to the Federation.
 
 
 16
 After this court held that the tax violated § 302 of the Taft-Hartley Act, Cutler v. American Federation of Musicians, 316 F.2d 546 (2 Cir.), cert. denied 375 U.S. 941, 84 S.Ct. 346, 11 L.Ed.2d 272 (1963), the Federation adopted a price differential plan. The new by-laws require a traveling orchestra to charge, for steady engagements, 10% more than the minimum fee for a local orchestra and, for single engagements, 10% more than the minimum price of either its home local or of the local in whose territory it is playing, whichever is greater. Orchestra leaders performing steady traveling engagements are barred from accepting any single engagements anywhere until after the steady engagement has been completed; and at the termination of the initial engagement, they are also barred from accepting a succeeding steady engagement in the invaded territory.
 
 
 17
 In addition to inhibiting traveling orchestras, the Federation also discourages the travel of its members by various restrictions on the importing of musicians by a local orchestra leader. Although musicians are privileged as a matter of right to transfer their membership from one local to another, provided that they do not compete for jobs in the new area for three months after their transfer, the emphasis of the Federation's regulations is strongly placed upon maintaining a protected job market for the members of each local and thereby assuring the strength of the Federation's local unions.
 
 
 18
 The appellants, who claim to be representative of a class of orchestra leaders, contend that the foregoing practices and regulations of the Federation and of Local 802 violate the Sherman Act in the following respects:
 
 
 19
 (a) they fix the minimum prices which may be charged for orchestral engagements;
 
 
 20
 (b) they require that orchestral engagements be played by the minimum number of sidemen which the union establishes;
 
 
 21
 (c) they impose territorial restrictions on the operations of orchestra leaders and sidemen;
 
 
 22
 (d) they establish a monopoly in the music industry;
 
 
 23
 (e) they require all employers to use, for orchestral engagements, a written form of contract provided by the union;
 
 
 24
 (f) they refuse to bargain with orchestra leader-employers about the terms and conditions of employment;
 
 
 25
 (g) they coerce orchestra leaders into becoming members of the union;
 
 
 26
 (h) they regulate the activities of booking agents with whom the orchestra leaders must deal; and
 
 
 27
 (i) they deny orchestra leaders the opportunity to accept engagements from caterers.
 
 
 28
 A threshold question is whether appellants do in fact represent a class under Rule 23(a), Fed.R.Civ.P., as well as themselves as individuals. Their claim is that they adequately represent the interests of the class of persons within the jurisdiction of Local 802 who devote all or almost all of their time to being orchestra leaders and, as such, operate primarily in the club date field. The district judge ruled that the action could not be maintained as a true class action under Rule 23(a) (1),[7] and we are in accord with the decision on that issue.
 
 
 29
 In a true class action, all of the members of the class, including those absent, are bound by the judgment. See Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921); Dickinson v. Burnham, 197 F.2d 973 (2 Cir.), cert. denied 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678 (1952); Giordano v. Radio Corporation of America, 183 F.2d 558 (3 Cir. 1950). Therefore the interests of the affected persons must be carefully scrutinized to assure due process of law for the absent members. See Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Since all members of the class are to be bound by the judgment, diverse and potentially conflicting interests within the class are incompatible with the maintenance of a true class action.
 
 
 30
 A spurious class action under Rule 23(a) (3), however, does not bindingly adjudicate the rights of members of the class who do not come before the court. Nagler v. Admiral Corp., 248 F.2d 319, 327 (2 Cir. 1957); Dickinson v. Burnham, supra, 197 F.2d at 979; California Apparel Creators v. Wieder, 162 F.2d 893, 896-897 (2 Cir.), cert. denied, 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393 (1947); York v. Guaranty Trust Co., 143 F.2d 503, 529 (2 Cir. 1944), reversed on other grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).
 
 
 31
 Although Rule 23(a) requires that the parties suing on behalf of the class insure the adequate representation of all members of the class without distinguishing between true and spurious class actions, the res judicata distinction between the two is vital. A much stricter standard for determining the adequacy of representation should obtain where there are non-intervenors who would be bound by the judgment. See Oppenheimer v. F. J. Young & Co., 144 F.2d 387, 390 (2 Cir. 1944); cf. York v. Guaranty Trust Co., supra, 143 F.2d at 528, n. 52. ("As the suit comes within Rule 23(a) (3), so that a judgment will not be res judicata as to * * * [non-intervenors], there is no necessity for a searching inquiry concerning the adequacy of her representation of others in the class.")
 
 
 32
 It is apparent that the present case does not qualify as a true class action under Rule 23(a) (1). It was brought by orchestra leaders as a direct challenge to the unions' control in the music industry, but there is evidence that many orchestra leaders are willing members of the union and subscribe to its policies; and there was no evidence offered by the appellants that such a group did not exist. Indeed, the unions' price-fixing programs would assure those who are less successful and well-known of earning at least the union fee when they work instead of the lower sum they might get under free competition. The desire to protect their interests gives them the same motivation that generates most horizontal price-fixing arrangements. Similar economic benefits to orchestra leaders are inherent in other of the unions' regulations, for example, the restrictions on traveling engagements. Thus appellants' representation cannot be said fairly to insure that the interests of these absent orchestra leaders will be protected. Hansberry v. Lee, supra. Cf. Giordano v. Radio Corporation of America, supra 183 F.2d at 560. Consequently the judgment in this action can bind only the named defendants and the four individual plaintiffs before the court.
 
 
 33
 We are in agreement with the district court's conclusion that the question of whether the representation of appellants is adequate to support a spurious class action should not be answered at this time. Such an action is actually no more than a permissive joinder device. York v. Guaranty Trust Co., supra; California Apparel Creators v. Wieder, supra; Nagler v. Admiral Corp., supra. "It stands as an invitation to others affected to join in the battle and an admonition to the court to proceed with proper circumspection in creating a precedent which may actually affect non-parties, even if not legally res judicata as to them. Beyond this, as we in common with other courts have pointed out, it cannot make the case of the claimed representatives stronger, or give them rights they would not have of their own strength, or affect legally the rights or obligations of those who do not intervene." (Footnote omitted.) All-American Airways v. Elderd, 209 F.2d 247, 248 (2 Cir. 1954). 3 Moore, Federal Practice ¶ 23.10 (1) and (3). At the present time, nobody is attempting to intervene; until somebody does, it is not necessary to decide that issue.
 
 
 34
 Application of the Sherman Act to the activities of labor unions involves a balancing of conflicting Congressional policies. Many of the devices which labor unions are permitted to use to further the interests of workers are similar to those forbidden to businessmen by the anti-trust laws. It is, of course, settled that "labor unions are to some extent and in some circumstances subject to the [Sherman] Act * * *" Apex Hosiery Co. v. Leader, 310 U.S. 469, 489, 60 S.Ct. 982, 989, 84 L.Ed. 1311 (1940). The history of the use of the anti-trust laws against labor unions and the resulting legislation passed by Congress make it clear that the Sherman Act's area of application in labor cases is now restricted to certain narrowly defined practices; the Norris-LaGuardia Act takes all "labor disputes," as therein defined, outside of the reach of the Sherman Act.[8]
 
 
 35
 Appellants contend that this case comes within the rule of Allen Bradley Co. v. Local 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), which creates an exception to the immunity afforded the unions for those cases in which a labor union combines with businessmen to achieve a commercial restraint. See also United States v. Employing Plasterers' Association, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954); United Brotherhood of Carpenters and Joiners v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947); United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941) (dictum). Cf. Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945), decided the same day as Allen Bradley Co. (holding a union exempt because there was no conspiracy with a business group); Cedar Crest Hats, Inc. v. United Hatters Union, 362 F.2d 322 (5 Cir. 1966); Greenstein v. National Skirt and Sportswear Association, Inc., 178 F.Supp. 681 (S.D.N.Y. 1959), appeal dismissed 274 F.2d 430 (2 Cir. 1960). Under the appellants' view of this case, there is a conspiracy by the unions with "non-labor" groups to engage in practices which are unlawful, because they are in restraint of trade. But the facts do not support such a conclusion.
 
 
 36
 Allen Bradley Co. was a case involving a conspiracy between businessmen and a labor union to prevent goods produced outside of the New York area from being sold within that area. The purpose of this compact was to create a local business monopoly. For a union's activity to fall outside of the protection of the definition of a "labor dispute" in § 13 of the Norris-LaGuardia Act (see footnote 3, supra), it must be shown that there was a conspiracy with a "non-labor group." That principle was reaffirmed by the opinion of the Court in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Three members of the Court in a separate concurring opinion concluded that the trier could infer such a conspiracy from the fact of an industry-wide collective bargaining agreement which tended to achieve an unlawful restraint. See the concurring opinion, 381 U.S. at 673, 85 S.Ct. 1585. In Pennington, the claim was that the United Mine Workers had "entered into a conspiracy with the large [coal mine] operators to impose the agreed-upon wage and royalty scales upon the smaller, nonunion operators, regardless of their ability to pay and regardless of whether or not the union represented the employees of these companies, all for the purpose of eliminating them from the industry, limiting production and pre-empting the market for the large, unionized operators." 381 U.S. at 664, 85 S.Ct. at 1590. It was for that reason that the union's wage agreement was not exempted from the anti-trust laws.
 
 
 37
 In the present case there is no evidence of a conspiracy between Local 802, or the Federation, and orchestra leaders to eliminate competitors, fix prices or achieve any other commercial restraint, nor was such a finding made by the district judge. Rather, the record establishes that all restraints were instituted unilaterally by the unions and acquiesced in by the orchestra leaders. Nor does the fact that the unions reached agreements with non-labor groups — booking agents, recording companies and others — place this case within the exception.
 
 
 38
 Nevertheless, there is a narrower ground upon which the legality of the unions' activities must be tested. If the unions coerced orchestra leaders with regard to a matter which is not a "term or condition of employment," they would not be exempt from the provisions of the Sherman Act, because the Norris-LaGuardia Act affords immunity from the impact of the anti-trust laws only for "labor disputes"; it does not provide a blanket exemption.
 
 
 39
 This rule is readily apparent from the Supreme Court's disposition of Local Union No. 189 v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), decided the same day as Pennington. In that case, the Meatcutters' and Butchers' Union sought to prevent any store in the Chicago area from selling meat except during the hours of 9:00 A.M. to 6:00 P.M. All members of a bargaining association of stores acceded to the union's demand except Jewel Tea Co., which held out. The union called a strike against it which thereby forced Jewel Tea to acquiesce. On Jewel Tea's suit to void this condition in its contract with the union, the district court held that there was no evidence of a conspiracy between the union and the retailers' association to impose the restricted marketing hours on the company. The case thus came to the Supreme Court "stripped of any claim of a union-employer conspiracy against Jewel." 381 U.S. at 688, 85 S.Ct. at 1601. Mr. Justice White, announcing the decision of the Court, said that the marketing hours restriction would not have been immune if it had not been a mandatory subject of collective bargaining, which the Court held that it was. In a concurring opinion, Mr. Justice Goldberg, writing for himself and two other members of the Court, was in essential agreement with this position, but took issue with what he thought was Mr. Justice White's "narrow, confining view of what labor unions have a legitimate interest in preserving and thus bargaining about." 381 U.S. at 727, 85 S.Ct. at 1624. He conceded, however, that the "direct and overriding interest of unions in such subjects as wages, hours, and other working conditions, which Congress has recognized in making them subjects of mandatory bargaining, is clearly lacking where the subject of the agreement is price-fixing and market allocation." 381 U.S. at 732-733, 85 S.Ct. at 1626.
 
 
 40
 These statements are applicable as well to the present case. Here, of course, since the unions do not bargain with orchestra leaders or with music purchasers in the club date field, the unions' protective provisions do not, as in Jewel Tea, appear in agreements with employers. They are, instead, unilaterally adopted by the unions and complied with by the orchestra leaders because of the threats of retaliation present in the unions' by-laws. The policy considerations are, however, the same.
 
 
 41
 "[E]xemption for union-employer agreements is very much a matter of accommodating the coverage of the Sherman Act to the policy of the labor laws." Local Union No. 189 v. Jewel Tea Co., supra, at 689, 85 S.Ct. at (White, J.). Thus, in the absence of an illegal conspiracy, mandatory subjects of collective bargaining carry with them an exemption; the national labor policy demands that the parties be permitted freely to reach agreement on terms and conditions directly affecting the working man. See Local 24 of Intern. Broth. of Teamsters etc., v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959). Cf. United States v. American Federation of Musicians, 47 F.Supp. 304 (N.D.Ill.1942), aff'd per curiam 318 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120 (1943); United States v. Carrozzo, 37 F.Supp. 191 (N.D.Ill.1941), aff'd per curiam sub nom. United States v. International Hod Carriers, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508 (1941); Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 98-99, 61 S.Ct. 122, 85 L.Ed. 63 (1940). Indeed, neither management nor labor could refuse to bargain about such subjects. National Labor Relations Act §§ 8(a) (5), (b) (3), (d), 49 Stat. 452 (1935), as amended 29 U.S.C. §§ 158(a) (5), (b) (3), (d) (1959). On matters outside of the mandatory area, however, no such considerations govern because the national labor policy does not require management and labor to bargain about them.
 
 
 42
 In light of the foregoing, we conclude that the unions' establishment of price floors on orchestral engagements constitutes a per se violation of the Sherman Act. The price of orchestral engagements is not a subject of such direct and overriding interest to the unions, as representatives of sidemen and sub-leaders, that it is a mandatory subject of collective bargaining; and the unions' representation of orchestra leaders, whom this court has held to be employers in the field under consideration, cannot serve as a basis for its establishment of uniform price floors. See Los Angeles Meat & Provisions Drivers Union v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962); United States v. Women's Sportswear Manufacturers' Association, 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805 (1949); Columbia River Packers Association, Inc. v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942); Local 36 of Intern. Fishermen & Allied Workers etc. v. United States, 177 F.2d 320 (9 Cir. 1949).
 
 
 43
 The arguments that musicians are interested in the prices charged by their employers, because they form the boundary of the wages they can expect to receive is not persuasive because it would justify an invasion of the proper function of management, which, with few exceptions, would go beyond any balancing of the labor and anti-trust laws and effect the complete paralyzation of the latter. See Hawaiian Tuna Packers, Ltd. v. International Longshoremen's Union, 72 F.Supp. 562 (D.Haw.1947). The same principle would support union-instigated price-fixing in any industry.
 
 
 44
 Appellees also argue, in justification, that historically many orchestra leaders have been financially irresponsible, and the only way to assure that sidemen will be paid is to make certain that orchestra leaders have profits. But, while the history of an industry has a bearing upon whether a subject is of direct interest to labor unions, see Greenstein v. National Skirt & Sportswear Ass'n, supra; cf. Fibreboard Paper Products Corp. v. N.L. R.B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed. 2d 233 (1964), such assurances that leaders will pay their sidemen can be achieved by means much less drastic than price fixing.
 
 
 45
 To be distinguished from the present action are cases like Local 24 of Intern. Broth. of Teamsters etc. v. Oliver, supra. There the union was permitted to compel a carrier to pay certain wages to its employees and also to pay a profitable rental to owner-drivers, who were independent contractors performing the same function as union members. The prices received by the owner-drivers were a term or condition of employment of the union members, because "an inadequate rental might mean the progressive curtailment of jobs through withdrawal of more and more carrier-owned vehicles from service." 358 U.S. at 293-294, 79 S.Ct. at 304. Cf. Milk Wagon Drivers' Union v. Lake Valley Products, Inc., supra. Here, the attempt to establish price minima, when orchestra leaders do not actually perform with their orchestras, cannot be justified on the ground that there is job or wage competition or any other economic interrelationship between them and other employees represented by the unions. See Los Angeles Meat and Provision Drivers Union v. United States, supra 371 U.S. at 103, 83 S.Ct. 162. The establishment of price floors by union fiat may seem to be a different matter, however, when the orchestra leader actually performs with his orchestra. In that situation the services of a sub-leader would not be required and the leader may in this way save the wages he would otherwise have to pay. Consequently, he could make the services of his orchestra available at a lower price than could a non-performing leader.
 
 
 46
 The cases make it clear, however, that price-fixing generally is not only not a mandatory subject for collective bargaining but is one toward which union activity may not be directed without violating the anti-trust laws. The unions assert that in this case the price-fixing is essential to the mandatory subject of job protection, as it was in Local 24 of Intern. Broth. of Teamsters etc. v. Oliver, supra; but in that case the union members were faced with the probability that, if a particular minimum price were not charged as rent by the owner operators of the vehicles, the employee-drivers, who were members of the union, would have to accept substandard wages or see their jobs entirely "contracted out" by the employer.[9] The circumstances constituting a possible threat to the employment of sub-leaders or the displacement of a sideman in the present case are not at all comparable. Nor is there any authority for holding that an employer must bargain on a labor union's demand that the employer perform no work himself which an employee could do. Moreover, many leaders become so because of their skill and reputation in playing certain instruments and their performances with their orchestras enhance the demand for the orchestras and provide more work for employees rather than less as is the case of "contracting out." See Fibreboard Paper Products Corp. v. N.L.R.B., supra, 379 U.S. at pp. 220-225, 85 S.Ct. 398 (Stewart, J. concurring).
 
 
 47
 Issues quite different in nature from price-fixing are raised by the appellants concerning travel restrictions and employment quotas, because both are mandatory subjects of collective bargaining and reflect union interest in maintaining the job market. See United States v. American Federation of Musicians, supra; United States v. Carrozzo, supra. Cf. Fibreboard Paper Products Corp. v. N.L.R.B., supra. Moreover, local unions have a direct interest in protecting the job market for their workers, cf. Rambusch Decorating Co. v. Brotherhood of Painters, 105 F.2d 134 (2 Cir.), cert. denied 308 U.S. 587, 60 S.Ct. 110, 84 L.Ed. 492 (1939), so that a music purchaser, for example a recording company, cannot refuse to bargain on a union's demand that only musician-employees who belong to the local union be employed. Cf. N.L.R.B. v. Bradley Washfountain Co., 192 F.2d 144, 154 (7 Cir. 1951); N.L.R.B. v. Andrew Jergens Co., 175 F.2d 130, 134 (9 Cir.), cert. denied 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503 (1949) (Union shop held mandatory subject of collective bargaining). In the present case, since the employers do not remain within the jurisdiction of any local when they are traveling, the only realistic way to achieve local security is through the enforcement of restrictions by the national union. See Rambusch Decorating Co. v. Brotherhood of Painters, supra. As neither the travel restrictions nor the employment quotas were instituted in furtherance of a conspiracy with a non-labor individual or group, they are immune under the Norris-LaGuardia Act.
 
 
 48
 Appellants' contention that the Federation is an unlawful monopoly involves the claim that its achievement of a closed shop violates the Sherman Act. A closed shop dispute, however, concerns a "term or condition of employment," and therefore is exempt. See United States v. American Federation of Musicians, supra. Cf. N.L.R.B. v. Bradley Washfountain Co., supra; N.L.R.B. v. Andrew Jergens Co., supra. As a union's pursuit of a closed shop is protected, the accomplishment of its objective cannot be declared to be a violation of the Sherman Act. See Kolb v. Pacific Maritime Ass'n, 141 F.Supp. 264 (N.D.Cal.1956). See generally Apex Hosiery Co. v. Leader, supra; United States v. Gold, 115 F.2d 236 (2 Cir. 1940). Rather, the elimination of price competition based upon inequality of labor standards is a legitimate and recognized objective of any national labor organization. See United Mine Workers v. Pennington, supra 381 U.S. at 666, 85 S.Ct. 1585; Apex Hosiery Co. v. Leader, supra 310 U.S. at 503, 60 S.Ct. 982; Cox, Labor and the Antitrust Laws — A Preliminary Analysis, 104 U.Pa.L.Rev. 252, 254-255 (1955).
 
 
 49
 The appellants also contend that the unions merely by requiring orchestra leaders to use their Form B contract violate the anti-trust laws. This contract serves primarily as a reporting device which enables them to insure against violations of wage scales and other regulations. The use of such a standardized contract, without more, does not under ordinary circumstances constitute an unreasonable restraint of trade; if there are specific provisions in it which do, the complaint should so allege. Of course, the contract form provided for the club date field must, consistently with this decision, omit any provision which would, in effect, constitute price-fixing.
 
 
 50
 The charges concerning the unions' refusal to bargain with orchestra leaders and their activities in putting pressure on them to become union members constitute allegations of prima facie violations of the National Labor Relations Act. See Labor Management Relations Act of 1947, 61 Stat. 140, adding §§ 8(b) (3) and 8(b) (4) (ii) (A), 29 U.S.C. §§ 158(b) (3), (b) (4) (ii) (A) (1959). Whether unfair labor practices were committed, however, must be considered in the first instance by the National Labor Relations Board on complaint of the General Counsel. The only question before us is whether the same practices also infringe the Sherman Act. We conclude that they do not. A labor union's refusal to deal has been held to be exempt in the absence of a conspiracy with businessmen. Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945). Moreover, the purpose behind the unions' action makes it apparent that there is no violation involved. Unlike Hunt v. Crumboch, supra at 826, 65 S.Ct. 1545, et seq. (dissenting opinions), refusal to bargain here is not aimed at eliminating a competitor from the product market, but rather at achieving uniformity of labor standards.
 
 
 51
 The exertion of pressure on orchestra leaders to join the union reflects a legitimate union concern for the closed shop and is not to be confused with cases in which labor unions have imposed membership upon employers who do not present job threats to union members. See, e. g., Los Angeles Meat & Provision Drivers v. United States, supra; United States v. Fish Smokers' Trade Council, Inc., 183 F.Supp. 227 (S.D.N.Y.1960). The same orchestra leaders who are "employers" in the club date field are very often "employees" when they perform as sidemen or sub-leaders or when in other fields the purchaser of music is actually the employer. Moreover, even those orchestra leaders who, as employers in club dates, lead but never perform as players, are proper subjects for membership because they are in job competition with union sub-leaders; each time a non-union orchestra leader performs, he displaces a "union job" with a "non-union job." Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., supra. Although there might be no such justification in the case of one who managed an orchestra but who never performed as a leader or player, we need not reach that question since Judge Levet found that no significant pressure to become members has been exerted by the union on Carroll and Peterson, the two plaintiffs who manage orchestras but do not perform.
 
 
 52
 Union by-laws prohibit the members from accepting engagements with or making any payments to caterers. Whether such a regulation is exempt from the Sherman Act may depend upon the effect on the terms and conditions of union members' employment of the bookings with, and kickbacks to, caterers. But the appellants have not shown that they were injured by the regulation. There is nothing in the record which tends to establish that the appellants suffered a loss or reduction in engagements or that they were confined to less profitable contracts because of their inability to deal with caterers. The appellants, therefore, lack standing to challenge the lawfulness of the regulation. Clayton Act § 4, 38 Stat. 731 (1914), 15 U.S.C. § 15 (1959).[10]
 
 
 53
 The objection to the unions' regulation of booking agents fails for a like reason. Their proscription of booking agents who deal with non-union musicians is clearly exempt on the same ground as the maintenance of a closed shop. The unions, however, also establish ceilings on booking agents' commissions. These provisions might deny some orchestra leaders the opportunity to bid competitively for engagements offered by booking agents, but there is no proof that the appellants attempted to offer booking agents a higher commission or that they would do so if given the chance. Consequently they lack standing to raise this issue.
 
 
 54
 The judgment of the district court is affirmed except for the price-fixing charge. The case is remanded to the district court to fashion an order enjoining the unions from enforcing the price restrictions against the four appellants and for a determination of what damages, if any, they have suffered.
 
 
 55
 The resulting judgment should provide that no costs will be taxed against any of the parties.
 
 
 
 Notes:
 
 
 [1]
 Carroll v. Associated Musicians, 206 F. Supp. 462 (S.D.N.Y.1962), affirmed, 316 F.2d 574 (2 Cir. 1963); Cutler v. American Federation of Musicians, 211 F.Supp. 433 (S.D.N.Y.1962), 316 F.2d 546 (2 Cir.), cert. denied 375 U.S. 941, 84 S.Ct. 346, 11 L.Ed.2d 272 (1963). By stipulation, the testimony in those actions is made a part of the record in this action
 Appellants' motions for preliminary injunctions were passed upon on appeal by this court in Carroll v. Associated Musicians, 284 F.2d 91 (2 Cir. 1960), affirming 183 F.Supp. 636 (S.D.N.Y.1960); Carroll v. American Federation of Musicians, 295 F.2d 484 (2 Cir. 1961); and Carroll v. American Federation of Musicians, 310 F.2d 325 (2 Cir. 1962).
 
 
 [2]
 Section 6 of the Clayton Act, 38 Stat. 731 (1914), 15 U.S.C. § 17 (1959) provides:
 "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor * * * organizations, instituted for the purposes of mutual help * * * or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."
 Section 20, of the Clayton Act, 38 Stat. 738 (1914), 29 U.S.C. § 52 (1959) provides:
 "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which there is no adequate remedy at law * * *
 And no such restraining order or injunction shall prohibit any person or persons [from striking, assembling, organizing, etc.] * * *"
 
 
 [3]
 Section 4 of the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C. § 104 (1959), provides:
 "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons * * * from doing, whether singly or in concert, any of the following acts:
 [striking, joining a labor union, giving strike benefits, lawfully aiding in a labor dispute, publicizing a dispute, assembling, etc.]
 "The term `labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." Norris-LaGuardia Act § 13, 47 Stat. 73 (1932), 29 U.S.C. § 113 (c) (1959).
 
 
 [4]
 26 Stat. 208 et seq. (1890), 15 U.S.C. §§ 1 and 2 (1959):
 Section 1: "Every contract, combination
 in the form of trust or otherwise,
 or conspiracy, in restraint
 of trade or commerce
 among the several States, or
 with foreign nations, is declared
 to be illegal * * *"

 Section 2: "Every person who shall monopolize
 or attempt to monopolize
 or combine or conspire
 with any other person or persons,
 to monopolize any part
 of the trade or commerce
 among the several States, or
 with foreign nations, shall be
 deemed guilty of a misdemeanor
 * * *"
 
 
 [5]
 Article IV, § 1(h) of Local 802's bylaws
 
 
 [6]
 The other required charges include an 8% addition, equivalent to social security costs, minimum charges for the carting of instruments and mileage fees for travel to the engagement and the standard 10% surcharge for traveling engagements
 
 
 [7]
 Rule 23(a), Fed.R.Civ.P. in pertinent part provides:
 "If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is (1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;
 * * * * *
 (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."
 
 
 [8]
 Although the statute is cast in terms of the federal courts' jurisdiction to grant injunctive relief, it also applies to criminal prosecutions under the anti-trust laws, United States v. Hutcheson, 312 U.S. 219, 234-235, 61 S.Ct. 463, 85 L.Ed. 788 (1941), and cases at law
 
 
 [9]
 A labor union may insist, of course, that employers "contract out" no work which is otherwise performed by union members. N. L. R. B. v. Adams Dairy, Inc., 379 U.S. 644, 646, 85 S.Ct. 613, 13 L.Ed.2d 550 (1965), reversing 322 F.2d 553 (8 Cir. 1963); Fibreboard Paper Products Corp. v. N. L. R. B., supra; Town & Country Manufacturing Co. v. N. L. R. B., 316 F.2d 846 (5 Cir. 1963), enforcing 136 NLRB 1022 (1962)
 
 
 [10]
 "Any person who shall be injured in his business or property by reason of any thing forbidden in the antitrust laws may sue * * *"
 
 
 
 56
 FRIENDLY, Circuit Judge (concurring and dissenting):
 
 
 57
 Agreeing with so much of Judge Anderson's excellent opinion as affirms rulings of the District Court, I must dissent from the portion that reads for reversal. I do this with hestitation since the line between those forms of union activity that are permissible and those that run afoul of the antitrust laws is anything but bright. In my view, however, the majority have failed to take adequate account of characteristics of the business here before us that render it sui generis, as Judge Levet with the years of experience gained from handling this and related actions, see fn. 1 to the majority opinion, has so thoroughly appreciated.
 
 
 58
 If club dates were always or almost always handled by non-performing leaders who devoted themselves exclusively or mainly to that activity, I would agree that fixing a minimum spread between the price paid by the buyer and the expenses incurred by the seller was not a "legitimate object" of union activity within the shelter of §§ 6 and 20 of the Clayton Act read in the light of § 4 of the Norris-LaGuardia Act. Such cases, however, are simply a rather small point at one end of a spectrum. Beginning with the single sideman "leading" himself, this ranges through the sideman who picks up two or three engagements a year as leader of a larger group, the performer who spends a fair portion of his time as a leader, the musician who does nothing but lead, and the exclusive leader having several bands with engagements at the same time,[1] up to the few "leaders" who have ceased to lead at all. Obviously this means a high degree of interchangeability in work functions and competition among union members for posts as leaders.[2]
 
 
 59
 The provision my brothers condemn as offending the Sherman Act is that a leader must obtain an extra fee — 25% of his scale when he leads himself, 50% when he leads another, 75% when he leads two others, and 100% when he leads three or more others — plus 8% of the aggregate scale wages to cover social security and unemployment insurance taxes and bookkeeping. Taking the first case first, I fail to see why protecting the member who wants to make an extra charge of 25% when he assumes the additional burden of getting an engagement against being undercut by others willing to forgo it is not as legitimate a union objective as setting a differential for a sideman's playing more than one instrument or engaging in rehearsal. As the size of the band increases, the time and cost of obtaining engagements, picking the sidemen, and making sure they are on hand at the appointed time and place also grow. If the union wants to see that such services are compensated rather than have some members perform them without remuneration for their time, effort or out-of-pocket expenses, this objective does not cease to be "intimately connected with wages, hours and working conditions" and thereby without the protection from the antitrust laws afforded by the Clayton Act, see Local 189, Amalgamated Meat Cutters Union v. Jewel Tea Co., 381 U.S. 676, 689-690, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) (White, J.), either because we have held the leader to be an "employer" within § 302 of the Labor Management Relations Act, Carroll v. American Federation of Musicians, 295 F.2d 484, 486 (2 Cir. 1961); Cutler v. American Federation of Musicians, 316 F.2d 546 (2 Cir.), cert. denied, 375 U.S. 941, 84 S.Ct. 346, 11 L.Ed.2d 272 (1963), or because the arrangements between the leader and the father of the bride are not themselves within the national labor policy. The fact that the leader is in part an entrepreneur does not deprive the union of a legitimate interest in his earnings up to the point where his services both as a performing artist and as a salesman and manager have been adequately compensated. Whether Local 189, Amalgamated Meat Cutters Union v. Jewel Tea Co., supra, ultimately comes to mean that employer-union agreements on mandatory subjects of collective bargaining are generally or are always exempt from the antitrust laws, to read that case as establishing that only such union activities enjoy exemption would be a serious misunderstanding. Where, as here, the union rule merely sets a floor under the price at which one union member may sell his services to customers in competition with others, the union needs no such special justification as it did in Jewel Tea for regulating what would ordinarily be management prerogatives of independent businessmen employing union members. See Los Angeles Meat & Provision Drivers Union v. United States, 371 U.S. 94, 103 and 104-108, 83 S.Ct. 162, 9 L.Ed.2d 150 (concurring opinion of Mr. Justice Goldberg) (1962); cf. Local 24, Int'l Bhd. of Teamsters, etc. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959). A different result might be warranted if the floor were set so high as to cover not merely compensation for the additional services rendered by a leader but entrepreneurial profit as well. But there has been no such showing here.
 
 
 60
 I would affirm the dismissal of the complaint.
 
 
 
 Notes:
 
 
 [1]
 In all these categories the leader usually plays an instrument at least part of the time when he is leading
 
 
 [2]
 An exhibit showed that for the period April 1-December 31, 1960, 6589 of Local 802's 30,000 members acted as leaders for club dates. A group of 118 leaders each had from 51 to more than 200 engagements, and a second group of 208 had from 21 to 50. On the other hand, 2789 acted as leader only once, 3062 from 2 to 9 times, and 608 from 10 to 20. Although appellants regard these figures as showing that the first two groups stand apart from the others, they seem to me to show the contrary